## <u>MATERIALS HANDLING SERVICE AGREEMENT</u>

    This Materials Handling Service Agreement (the "Agreement"), is made as of the 16th day of July 2007, by and between ARNOLD LOGISTICS, LLC. ("Arnold"), a Pennsylvania limited liability company, with its principal office at 4410 Industrial Park Road, Camp Hill, Pennsylvania 17011, NEW WORLD PASTA COMPANY ("New World"), a Delaware corporation, with its principal office at 85 Shannon Road, Harrisburg, Pennsylvania 17112, and RIVIANA FOODS INC., a Delaware corporation, with its principal office at 2777 Allen Parkway, Houston, Texas 77019 ("Riviana").

### BACKGROUND

    WHEREAS, Arnold maintains a distribution center at 40 E. Main Street, New Kingstown, Pennsylvania 17072 ("<u>Distribution Center</u>"); and

    WHEREAS, New World and Riviana wish to: (i) receive, store, handle, ship, transport and dispose of their food products, packaging materials and other related items at, to or from the Distribution Center; and (ii) receive logistical, warehousing and other related services from Arnold, both at the Distribution Center and otherwise; and

    WHEREAS, Arnold has assured New World and Riviana that it can provide the manpower, equipment, services, supplies and administrative support necessary to fully meet and provide all of New World and Riviana's requirements at and related to the Distribution Center, including without limitation all of New World and Riviana's logistical and warehousing requirements at the Distribution Center.

    NOW THEREFORE, in consideration of the mutual covenants hereinafter set forth, intending to be legally bound, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1:    <u>Definitions</u>.

    For the purposes of this Agreement the following definitions will apply:

    "Accessorial Charges" has the meaning set forth in Section 3.3

    "Accessorial Services" has the meaning set forth in Section 3.3

    "Additional Space Charge" has the meaning set forth in Section 2.1(c)

    "Applicable Procedures" mean those procedures with respect to the Scope of Services (as hereinafter defined) attached hereto as Exhibit F, as supplemented by those procedures and/or services set forth in a Manual (as hereinafter defined).

    "Compensation Schedule" has the meaning set forth in Section 3.3

    "Consumer Price Index" means the Consumer Price Index for All Urban Consumers (1982-84 =100), as published, on a monthly basis, by the Bureau of Labor Statistics of the U.S. Department of Labor.
    "Distribution Center" has the meaning ascribed thereto in the recitals to this Agreement.

1

RIV000281

"Early Termination Event" has the meaning set forth in Section 4.3(c)

"Early Termination Notice" has the meaning set forth in Section 4.3(c)

"Effective Date" shall be July 16, 2007

"Equipment" means that equipment and related items which are used, purchased or leased by Arnold in order to provide the Services (as hereinafter defined) hereunder, including: (i) certain hardware and related equipment located at the Warehouse and necessary for performing the Services; and (ii) equipment otherwise used at or to support the Warehouse in performing the Services.

"Expiration Date" has the meaning set forth in Section 4.3(a)

"Force Majeure" has the meaning set forth in Section 4.10

"Handling Charges" has the meaning set forth in Section 3.3

"Inventory" means those New World or Riviana goods or items which are described on Exhibit E, which Exhibit may be amended or modified by New World or Riviana in their sole discretion to include additional goods manufactured, sold, distributed or maintained by New World or Riviana of a similar nature for which the provision of the Services does not constitute a change in the Scope of Services and/or Operating Budget Assumptions (as hereinafter defined).

"Inventory Information Data" means all pertinent information concerning any special characteristics of the Inventory, including, but not limited to safety and health data, toxicological information, applicable environmental data, New World and Riviana's hazard communication program procedures used to comply with labeling and transportation requirements and Occupational Safety & Health Administration regulations, any governmental (state, local or federal) regulations, and such other information concerning the special characteristics of the Inventory and the procedures known to or developed by New World or Riviana that are associated with the receiving, storing, handling, shipping, transporting and disposing of the Inventory.

"Key Performance Indicator" has the meaning set forth in Section 2.8(b)

"Manual" means the dated and signed written procedures, if any, developed or to be developed by New World and Riviana, and provided to Arnold, for the receiving, storing, handling, shipping, transporting and disposing of the Inventory.

"Manufacturing Facility" means any New World or Riviana manufacturing facilities and/or their co-packers or co-manufactures or suppliers.

"Operating Budget Assumptions" means the Inventory Information Data, the type and mixture of Inventory, volume and other key operating assumptions set forth on Exhibit D which have been mutually developed by New World, Riviana and Arnold and upon which the cost and compensation elements of this Agreement have been developed.

"Pallets" means CHEP pallets or other suitable platforms on which the Inventory is stored.

"Recouped" means the following process by which a case of product or Inventory, which has damage to individual packages in the case, or the case itself, is repaired. In the example where there is damage

2

RIV000282

to individual packages in the case, the case is first broken down, the damaged packages are removed from the case, and the damaged packages are replaced by similar non-damaged packages with the same SKU and code dates as other packages in the case. In the example where there is damage to the case itself, the individual packages in the case are removed and any that are damaged are replaced with non-damaged packages with the same SKU and code date, and the case itself is replaced with a new non-damaged case of the same SKU and code date. Arnold will apply the code date to the outside of the case and, at the direction of New World or Riviana, will apply the symbol of "R" to the outside of the case as well.

"Relinquished Space Credit" has the meaning set forth in Section 2.1(d)

"Revised Compensation Schedule" has the meaning set forth in 3.3(a)

"Sanitation Manual" has the meaning set forth in Section 2.4(a)

"Scope of Services" means those services and procedures identified in Exhibit F and the Manual, if any.

"Services" means, collectively, the services as set forth in this Agreement including those services and procedures identified in Exhibit F and the Manual, if any, and the Applicable Procedures.

"Warehouse" means the approximately 391,500 square foot portion of the Distribution Center (referred to as "Base Storage Space") outlined on Exhibit W attached hereto which is being used in providing Services to New World and Riviana.

"Weekly Pallet Report" has the meaning set forth in Section 2.8(a)

# ARTICLE II
## ARNOLD'S DUTIES AND OBLIGATIONS

Section 2.1    General Duties.

(a) Arnold shall perform all of those tasks, responsibilities and duties which are required so as to ensure the proper, efficient, timely and cost-effective operation of the Warehouse to satisfactorily meet the needs of New World and Riviana including, but not limited to: shipment planning and execution; loading and unloading of Inventory; establishment and maintenance of proper storage procedures; storage of Inventory; Inventory rotation and tracing of the Inventory by manufacturer's date code; maintenance of complete and accurate perpetual Inventory and Warehouse records; the issuance of proper receipts and overage; shortage and damage reports with respect to all shipments received and shipped at, to and from the Warehouse; loading, unloading and switching of rail cars so as too minimize demurrage or other rail charges (which includes but is not limited to the ordering in from the railroad, and the unloading, on a seven day a week basis, the maximum number of rail cars necessary to fill the rail doors at Arnold's site); providing customer service; and all other activities in support of and compliance with the Applicable Procedures and the Scope of Services specified in Exhibit F attached hereto and incorporated by reference as if fully set forth herein. Arnold further warrants and represents that it shall provide the Services in a professional and timely manner which is commensurate with the level and quality of similar services provided by other well-regarded suppliers in the industry.

(b) If New World or Riviana desires to revise or modify any of the Applicable Procedures, New World and Riviana shall timely provide the requested modifications to Arnold and, if the time and cost of complying with the same are not within the Scope of Services or affect the Operating Budget Assumptions, Arnold, as hereinafter set forth, shall have the right to seek a compensation adjustment for the extra cost in complying with

3

the same. Such compensation adjustment will not exceed the out-of-pocket costs incurred by Arnold to provide the requested modifications, plus a reasonable margin not to exceed Arnold's then current margin (on a percentage basis) on the New World and Riviana business.

(c) Upon the request of New World or Riviana from time to time, to the extent additional storage space is available at the Distribution Center at the time of such request, Arnold shall provide New World or Riviana with additional storage space for Inventory at the Distribution Center (in addition to the 391,500 square feet of the storage space which is currently used to store the Inventory). Alternatively, to the extent additional storage space is available at the Distribution Center and Arnold is approached by or approaches a third party seeking such space, Arnold will provide New World and Riviana with a right of first refusal for the storage space sought by that third party. Any such request made by New World or Riviana for additional storage space, or any affirmative response by New World or Riviana to the right of first refusal, shall specify the number of additional square feet required by New World or Riviana and shall be made in writing not less than thirty (30) days prior to the beginning month date on which such additional storage space is required. The total square footage of monthly storage space will be the peak storage provided during any given month (391,500 square feet plus additional storage in square feet equals total peak storage in square feet per month). All storage costs are to be invoiced on a full month basis. New World or Riviana shall pay Arnold for the additional storage space at the same rate as the rate applicable to the Base Storage Space (the "Additional Space Charge"). The Additional Space Charge shall not be considered an Accessorial Charge for purposes of this Agreement and is therefore not subject to an adjustment pursuant to Section 3.3(b) hereof.

(d) New World and Riviana shall have the right from time to time to relinquish to Arnold any storage space or rows of pallet positions that are no longer required to store the Inventory at the Distribution Center and thereby reduce the aggregate storage space made available by Arnold for the Inventory to a number of square feet (below 391,500 square feet but not less than 345,000 square feet) that New World and Riviana may deem appropriate, upon giving Arnold not less than ninety (90) days written notice of such determination. In the event that New World and Riviana relinquishes to Arnold any storage space or rows of pallet positions pursuant to this Section 2.1(d), New World and Riviana's payment obligations set forth in Section 3.3 shall be reduced by an amount equal to $5.54 per square foot per year for each square foot of storage space that is relinquished by New World and Riviana pursuant to this Section 2.1(d) (the "Relinquished Space Credit"), it being understood that the Relinquished Space Credit shall be prorated by the number of days that any storage space or rows of pallet positions is relinquished by New World and Riviana to Arnold pursuant to this Section 2.1(d). New World and Riviana will provide Arnold ninety (90) days prior notice to regain any previously relinquished aggregate storage space. It being understood that the regained space invoicing shall be prorated by the number of days that any storage space or rows of pallet positions is regained by New World and Riviana to Arnold pursuant to this Section 2.1(d).

(e) Arnold shall: (i) not accept, store or house at the Distribution Center any goods from of any other person or entity which may adversely affect the quality or storage life of the Inventory; and (ii) notify in writing New World and Riviana not less than thirty (30) days in advance of using the Distribution Center to store inventory or merchandise of any other party, such notice providing, at a minimum a full description of the inventory or merchandise to be stored, and Arnold shall timely respond to inquiries for additional information by New World or Riviana..

(f) Arnold shall permit New World and Riviana, or any of their agents, consultants or representatives, at any and all reasonable times, and upon prior notice and without interruption of Arnold's performance of Services, to review and inspect the Warehouse and, in addition, to audit, review or inspect the records of Arnold relating to the Inventory and/or the operation of the Warehouse, whether stored at the Warehouse or elsewhere.

RIV000284

(g)  Except as required by law or court order, or with prior approval from New World or Riviana, which will not be unreasonably withheld, Arnold shall not permit any person, other than authorized personnel of Arnold, New World or Riviana, to have access to the Inventory and the storage areas located in the Warehouse or elsewhere.

(h)  Arnold will comply with the Trailer Seal Policy attached to this Agreement as Exhibit K.

Section 2.2      Labor.

Arnold shall employ and assign to the Warehouse adequately trained and competent personnel sufficient in number to carry out all of the duties and obligations required to be performed by Arnold hereunder. The personnel shall be the employees of Arnold, and not the employees of New World or Riviana, and Arnold shall provide worker's compensation insurance coverage as required by law and all other fringe benefits Arnold deems appropriate. Arnold shall indemnify, defend and hold harmless New World and Riviana, their parent and affiliated companies, and the directors, officers, employees, agents and contractors of each of them, from and against any and all claims, losses, costs, liabilities, interest, expenses, or actions, public or private (including fines, penalties and reasonable attorney's fees) brought by Arnold's employees or agents and/or arising out of Arnold' provision of labor hereunder; provided that the foregoing indemnification shall not apply if and to the extent that any claim, loss, cost, liability, interest, expense or action is found by a court of competent jurisdiction to have been caused in whole or in part by the willful misconduct or negligent acts or omissions of New World or Riviana, their employees, agents or contractors.

Section 2.3      Equipment.

Arnold shall provide all Equipment necessary to maintain and operate the Warehouse for New World and Riviana in accordance with the terms, covenants and conditions of this Agreement and its Exhibits; except that New World and Riviana may purchase and provide racking equipment to Arnold for Arnold to use solely for the purpose of this Agreement. The Equipment, including racking provided by New World and Riviana, if applicable, shall be maintained by Arnold in good and safe working order. Except for the racking identified above, Arnold, with respect to the Equipment, shall be considered the owner or lessee thereof for federal income tax and other purposes.

Section 2.4      Sanitation and Other Requirements.

(a)  Arnold shall:  maintain the Warehouse in a clean and orderly condition at all times; adhere to the sanitation guidelines developed from time to time by New World and Riviana and provided to Arnold in writing (the "Sanitation Manual");  engage a qualified Licensed Pest Control Operator for the term of the Agreement for the Distribution Center;  comply with the practices described in Exhibit J; and maintain good sanitation practices typical of well-run food grade distribution centers.  If Arnold in good faith believes that complying with any specified sanitation procedures set forth in the Sanitation Manual is not within the Scope of Services or the compensation arrangements, Arnold shall have the right to seek to recover from New World and Riviana any incremental out-of-pocket cost incurred by Arnold in complying with any such special procedures or Services. Arnold's duties hereunder (which the parties acknowledge are within the Scope of Services) shall include, but not be limited to:

(i) sweeping and scrubbing of floor areas one (1) time a week,  or more frequently as conditions dictate;

5

RIV000285

(ii) residual insecticide treatment of cracks and crevices every month, or more frequently as needed;

(iii) continual use and maintenance of "Ketch-All" wind-up rodent traps; and

(iv) the use of outside bait stations.

(b) New World and Riviana, or their representatives, may, but shall have no obligation to, inspect the Warehouse as often as New World and Riviana shall deem necessary and shall notify Arnold of any sanitation problems. Notwithstanding New World and Riviana's inspections, Arnold shall be solely responsible for assuring that the sanitation requirements set forth in Section 2.4 and otherwise in this Agreement are complied with. Arnold shall correct any sanitation problems, discovered by New World or Riviana or otherwise, in the manner and within the time periods set forth in the Sanitation Manual, if a copy of such Sanitation Manual is delivered to and received by Arnold, or as otherwise set forth in New World and Riviana's notice to Arnold provided pursuant to this Section 2.4(b), if copy of such Sanitation Manual has not been delivered to Arnold.

(c) Arnold shall comply with and adhere strictly to the requirements of any and all applicable federal, state and local laws, rules, regulations, ordinances and orders pertaining to the storage, handling and distribution of food and food products, as well as to any and all applicable federal, state and local laws, rules, regulations, ordinances and orders governing the purchase, storage, handling, application and disposal of hazardous or toxic wastes, materials or substances. Prior to permitting any governmental inspection of the Warehouse or of the inventory, Arnold shall immediately contact the appropriate New World and Riviana personnel who shall, in their sole discretion and where permitted by applicable law, approve of and participate in any such inspection. Arnold shall also comply with all other applicable federal, state and local laws, regulations and ordinances.

Section 2.5    Special Deliveries.

New World and/or Riviana, as applicable, shall be responsible for notifying Arnold in writing in advance of delivery of any Inventory that has special characteristics not previously disclosed to Arnold which may affect the receiving, storing, handling, shipping, transporting or disposing of such Inventory or which may affect the Distribution Center. Unless otherwise expressly agreed or unless identified as part of or within the intended type of the Inventory set forth on Exhibit E, Arnold may refuse, without liability of any kind, to accept any goods having special characteristics which would cause property damage or personal injury, or that are classified as a hazardous material or substance, as defined by any applicable federal, state or local statute, law, rule or regulation, now or hereinafter enacted, or which, pursuant to any lease for the Distribution Center or any covenant, condition or restriction on or for the Distribution Center, would make the acceptance of such goods unlawful or impermissible. In any such event, Arnold shall promptly notify New World and/or Riviana, as applicable of its refusal to accept any such goods and the reasons for its refusal and shall return the same to its originating point.

Section 2.6    Protection and Losses of Inventory.

(a) Arnold shall preserve and maintain the Inventory in as good a condition as such Inventory was received from New World or Riviana. At any time requested by New World or Riviana, and in accordance with the provisions of this Agreement, or at the termination or expiration of this Agreement, Arnold shall promptly return the requested Inventory to New World or Riviana in as good a condition as when received.

(b) Arnold shall make shipments of Inventory only as New World or Riviana may authorize in writing or other agreed to means. Arnold understands and agrees that each of New World and Riviana, on a separate company basis, will provide such instructions to Arnold. Arnold shall not be liable for receiving or shipping charges of any kind, including without limitation, demurrage or detention charges, unless such charges are the result of Arnold's breach of this Agreement, willful misconduct or negligent acts or omissions. New World and

RIV000286

Riviana shall pay and shall indemnify and hold Arnold harmless from any and all such charges or costs, except for those resulting from Arnold's breach of this Agreement, willful misconduct or negligent acts or omissions, for which Arnold shall indemnify and hold New World and Riviana harmless. The provisions of this subparagraph shall survive the termination of this Agreement.

(c) All returned inventory to the Warehouse must be accompanied by an authorized New World or Riviana Return Material Authorization (RMA). Upon the request of New World or Riviana, Arnold will fumigate the returned inventory before returning it to stock. Returned inventory without an authorized RMA will be not be accepted. Whenever any of the Inventory is returned to the Warehouse, Arnold shall promptly visually inspect and sort such returned Inventory and promptly report the return to New World or Riviana, as applicable, on forms provided or otherwise approved by New World and Riviana.

(d) Arnold shall be responsible for any losses or damages incurred by New World or Riviana, including but not limited to those losses or damages caused by or as a result of Arnold's improper shipment or failure to ship the Inventory, or lost, damaged or destroyed Inventory, which losses or damages are attributable to a breach of this Agreement by, or willful misconduct or negligent acts or omissions of, Arnold or its employees, representatives or agents provided that Arnold shall be liable only for damages directly incurred by New World or Riviana as a result of Arnolds's conduct and shall not be liable for fines or penalties payable to New World or Riviana customers or for other iIndirect or consequential damages.

(e) New World or Riviana, as applicable, shall be solely responsible for losses sustained by seizure, condemnation or spoilage of the Inventory unless caused by the negligence or willful misconduct of Arnold or the failure of Arnold to comply with the terms, covenants and conditions of this Agreement. Where, under the provisions of this paragraph, Arnold and New World or Riviana are each partially responsible for loss or damage to, or improper shipment of the Inventory, the costs thereof shall be shared in proportion to the extent that such loss, damage or improper delivery is attributable to each of them.

(f) Claims for lost or damaged Inventory must be made in writing no later than: (i) 120 days after the completion of the reconciliation of the complete physical inventory conducted in accordance with Section 2.7 of this Agreement, if such claims arise as a result of that physical inventory; or (ii) 60 days after New World or Riviana become aware of such claims if such claims arise from other sources, e.g., complaints of customers. No action may be maintained by New World or Riviana for loss or damage to Inventory unless a timely written claim has been given as provided for in the immediately preceding sentence.

Section 2.7    Inventory Shrinkage, Damage and Mis-Rotation.

(a) At New World and Riviana's request and expense, and on a date to be established by New World and Riviana, Arnold shall perform, under the surveillance of appropriate New World and Riviana personnel, up to two complete physical inventories (by SKU and quantity) during any calendar year of the Inventory belonging to New World, and separately, of the Inventory belonging to Riviana. Prior to any complete and physical inventory, Arnold will submit to New World and Riviana a separate detailed cost estimate for review and approval. Resulting invoices for complete and physical inventories for both New World and Riviana will be provided with supporting documentation Any physical inventory of both New World and Riviana are to be scheduled concurrently. In addition, at the request of New World and Riviana, Arnold shall conduct cycle counts of the Inventory of New World, and Riviana, on a separate basis, at Arnold's own expense.

(b) Final inventory reconciliation shall take place at the time of each complete physical inventory as described in Section 2.7(a). Arnold's Inventory records and New World and Riviana's Inventory records shall be reconciled, and Inventory balances jointly agreed to, as a basis for determining overages and shortages. Inventory shortages or overages from the physical inventories or cycle counts taken at the Warehouse shall be determined by netting shortages and overages across all commodity groupings of Inventory, on a separate

7

RIV000287

company basis, either at the time of a semi-annual physical inventory or as provided for in the Applicable Procedures. During any calendar year, net shortages or overages determined at the first semi-annual physical inventory for such calendar year (if conducted) shall be carried over to the second semi-annual physical inventory for such calendar year and shall be applied against net shortages or overages determined at such second semi-annual physical inventory at which time there shall be a reconciliation of shortages and overages. For the purpose of this Section 2.7(b) only, if at the completion of the annual physical inventory for any calendar year there are net shortages for Inventory on a separate company basis, Arnold shall be liable, subject to the provisions of this Agreement for the unaccounted Inventory at the manufactured cost per case (or stock-keeping unit) of New World or Riviana, as applicable. For the term of the Agreement, the agreed-upon manufactured cost per case (or stock-keeping unit) shall be the standard cost, plus freight and handling, of a New World or Riviana case (or stock-keeping unit), as applicable. There shall be no carryover of net shortages for Inventory from the completion of a physical inventory conducted in one calendar year to a physical inventory conducted in the next calendar year. Any claims for shortages of Inventory shall be made in accordance with Section 2.6(f) above. For the sake of clarity, it is understood that the above-described procedures are to be completed on a separate company basis, i.e., the Inventory of New World and Riviana are to be accounted for separately.

(c) In the event that this Agreement shall expire or otherwise terminate on a date which does not correspond with the last day of a calendar year, a final Inventory count shall take place prior to the date of termination or expiration and, a final Inventory reconciliation for such calendar year shall take place within three (3) months following the date of said expiration or termination.

(d) Damaged product shall be Recouped by Arnold. Mis-rotated or aged product shall be disposed of in accordance with New World and Riviana's written directions.

(e) The parties agree to a combined annual damage and shrinkage allowance of .125% (one and one quarter of one percent), which is equivalent to .00125, of annual throughput (throughput calculated as units in and units out divided by two). Damage shall apply to all damage for which Arnold is liable pursuant to the terms of this Agreement and the Scope of Work. Shrinkage shall apply to all loss of non-recoupable Depositor's Goods for which Arnold is liable pursuant to the terms of this Agreement and the Scope of Work. The projected annual damage and shrinkage allowance shall apply to any determinations of damages made prior to year end and no damages will be paid for until the entire damage and shrinkage allowance has been surpassed. In the event the damage and shrinkage allowance are surpassed, Arnold will be subject to those damages in excess of the allowances.

Section 2.8    Reports

(a) Arnold shall maintain complete and accurate accounting and inventory records to support and document its receipt, storage and shipment of Pallets. Promptly after the end of each week (and in any event by Tuesday of the next week), Arnold shall provide New World and Riviana, on an individual company basis, with an accounting and inventory of Pallets for the preceding week (each a "Weekly Pallet Report"). Each Weekly Pallet Report shall indicate the number of CHEP pallets and the number of any other suitable platforms on which the Inventory is stored (i) located at the Warehouse at the beginning of the preceding week, (ii) shipped from the Warehouse to each location of New World and Riviana's customers over the course of the preceding week, (iii) shipped to the Warehouse by New World and Riviana over the course of the preceding week, and (iv) located at the Warehouse at the end of the preceding week. Arnold shall be responsible for any costs or damages assessed by CHEP on New World or Riviana related to CHEP pallets which were damaged or lost when in the possession of and handled by Arnold.

8

RIV000288

(b)  Arnold shall prepare and provide New World and Riviana with a monthly report, on an individual company basis, within five (5) calendar days after the end of each calendar month detailing each variable (each a "Key Performance Indicator") identified on the Key Performance Indicator Schedule, attached hereto and made a part hereof as Exhibit A, for such calendar month and the previous thirteen (13) calendar months. The Key Performance Indicators may be used by New World and Riviana to monitor and evaluate Arnold's performance of the Services.

(c)  Arnold shall also prepare and provide New World and Riviana with:  (i) a monthly report within five (5) calendar days after the end of each calendar month detailing the information identified on the Account Profile Information Schedule, attached hereto and made a part hereof as Exhibit B; and (ii) such other reports as New World and/or Riviana may otherwise request.

Section 2.9    Service and Other Improvements.

The parties anticipate that the methods and resources used by Arnold to perform the Services will evolve and be supplemented and enhanced over time to keep pace with technological advancements and other improvements in the methods and resources available for performing the Services, and as a result of such advancements and improvements in the methods and resources available for performing the Services, Arnold's cost in performing the Services may decrease.  Upon request by New World and Riviana, Arnold shall permit New World and Riviana, and their employees, agents or representatives, to audit, review and inspect any and all financial and cost records, or other information or documents, of Arnold relating to or concerning in any way the Warehouse, the provision of services under this Agreement to New World or Riviana or Arnold's costs thereof. The parties agree that, notwithstanding any language to the contrary elsewhere in this Agreement, upon the request of New World and Riviana, the parties shall negotiate in good faith a gain-sharing mechanism and allocation whereby New World and Riviana share the benefit of any reduced costs which Arnold has benefited from since execution of this Agreement; provided, however, that if despite good faith negotiations the parties cannot reach agreement on a gain-sharing mechanism or allocation, the parties agree that fifty percent (50%) of the reduced costs achieved by Arnold shall be provided to New World and Riviana and reduce the charges under this Agreement accordingly.

Section 2.10    Customer Required Initiatives.

The parties anticipate that certain technological, logistical and/or other enhancements, modifications, and upgrades to the existing supply chain management systems utilized by Arnold and customers of New World and Riviana (similar to "UCC-128", "Advance Ship Notice 856", and/or other supply chain management systems utilized to provide an efficient Inventory shipment process) may be required by New World and Riviana's customers.  If any customer of New World or Riviana requires certain technological, logistical and/or other enhancements, modifications, and upgrades to be made to the existing supply chain management systems utilized by Arnold and such customer, then Arnold shall (i) furnish New World and Riviana with the estimated cost and expense of making such enhancements, modifications and upgrades in accordance with such customer's requirements and (ii) at New World and Riviana's request and expense,  make such enhancements, modifications and upgrades in accordance with such customer's requirements; except that to the extent Arnold is required to make such enhancements, modifications and upgrades for a customer or client of Arnold's unrelated to New World or Riviana, such enhancements, modifications or upgrades will be made by Arnold at no charge to New World or Riviana.

RIV000289

Section 2.11    Insurance.

(a)  Arnold shall secure and maintain at all times throughout the term of this Agreement, at its sole cost and expense, the following insurance coverage:

(i)  Warehouseman's legal liability insurance having limits of liability of not less than $25 million per occurrence.  New World and Riviana shall each be named as an additional named insured on the warehouseman's legal liability insurance policy.

(ii)  Statutory worker's compensation insurance or self-insurance meeting state requirements for all personnel employed by Arnold to carry out the duties of Arnold hereunder.

(iii)  Commercial general liability insurance having limits of liability of not less than $25 million per occurrence.  New World and Riviana shall each be named as an additional named insured on the commercial general liability insurance policy.

(b)  Promptly following the date of this Agreement, and thereafter at least ten (10) days prior to the anniversary date of each of the foregoing policies, Arnold shall furnish to New World and Riviana certificates of insurance for all of the commercial insurance coverages required to be carried by Arnold hereunder, and if Arnold's statutory worker's compensation coverage is provided by a commercial insurance carrier, a certificate of insurance for that coverage shall be furnished as well. Each certificate shall provide that the policy represented thereby shall not be cancelled or materially altered unless the insurance company providing coverage gives written notice to New World and Riviana of such cancellation or material alteration at least ten (10) days prior to the date on which the cancellation or material alteration is to take effect.  In the event that statutory worker's compensation coverage is provided by self insurance, Arnold shall (i) provide a certificate attesting to the existence and adequacy of such adequacy of such coverage (ii) not alter or modify such self insurance arrangement in a manner which may reasonably be expected to reduce such coverage without the prior written consent of New World and Riviana.

Section 2.12    Distribution Center Lease.

Arnold warrants and represents that it has a valid and enforceable lease of the Distribution Center (with an option to renew that lease for a term which expires no earlier than December 31, 2017)  with a third party which lease:  (i) is co-terminus with the term of this Agreement, and (ii) does not prohibit Arnold from performing any of its obligation under this Agreement.

Section 2.13    Railroad Service.

Arnold shall maintain railroad service into and out of the Warehouse.  In addition, Arnold will at their expense, maintain at standards acceptable to the railroad, sufficient rail track necessary to allow the railroad to switch cars in normal rail operations into and out of the Distribution Center.

## ARTICLE III
## NEW WORLD AND RIVIANA'S DUTIES

Section 3.1    General Duties.

New World and Riviana shall have the following general duties throughout the term hereof:

RIV000290

(a)  Pay all income, sales, and use or excise taxes assessed against the Inventory, their personal property or operations at the Warehouse.

(b)  Pay the Handling Charges, the Accessorial Charges and the Additional Space Charge required to be paid by them, on a separate company basis, under the terms of this Agreement.

Section 3.2    <u>Administration</u>.

New World and Riviana shall transmit their inventory, shipping and order information, on a separate company basis, to the Warehouse.

Section 3.3    <u>Rates:  Handling and Accessorial Charges, and One-Time Start-Up Costs</u>.

(a)  The parties acknowledge and agree that Arnold has prepared a compensation schedule, on a separate company basis for each of New World and Riviana, for the operation of the Warehouse through the Expiration Date (the "Compensation Schedule"), attached hereto and made a part hereof as Exhibit C, which is based, in part, on the operating assumptions set forth in the Operating Budget Assumptions. New World and Riviana shall each pay Arnold the Handling Fees, Management Fee and Storage Costs (both Fixed and Variable) as set forth and specified in the Compensation Schedule applicable to each of New World and Riviana (collectively, the "Total Charges") through the Expiration Date.   Arnold agrees that it will provide to New World and Riviana a proposed compensation schedule, with rent broken out separately, for a five (5) year renewal of this Agreement, which proposal will be provided to New World and Riviana no later than fifty-seven (57) weeks prior to the Expiration Date. Arnold further agrees that 1) the rent for such five (5) year renewal term shall be no greater than $4.586 per square foot per year and 2) Handling Fees,  Management Fee and Fixed Storage Cost (other than Rent, all as defined in Exhibit C) for such five (5) year renewal term will be no greater than the cumulative annual Consumer Price Index increases during the Original Term..

(b)  In addition, New World and Riviana may from time to time request the performance of additional services (the "<u>Accessorial Services</u>") by Arnold that are not anticipated in the Operating Budget Assumptions and are therefore not adequately provided for in Handling Charges. Charges for the Accessorial Services for the Original Term are set forth and specified in the Compensation Schedule (the "<u>Accessorial Charges</u>").  Accessorial Services shall not be performed, and Arnold shall not earn or charge any Accessorial Charges, unless and until New World or Riviana direct Arnold to perform the Accessorial Services in writing. If New World or Riviana direct Arnold to perform the Accessorial Services in writing, and Arnold performs such services, then Arnold shall be entitled to charge either New World or Riviana, as applicable, and New World or Riviana shall pay, the Accessorial Charges applicable to the Accessorial Services performed for that specific company.

(c)  Upon request by any party, the parties hereby agree to review the Accessorial Charges (but not the Handling Charges) on an annual basis, throughout the Original Term, on the anniversaries of the Effective Date and, if appropriate, negotiate in good faith changes to the Accessorial Charges which shall be effective for the one year period commencing on such anniversary.  If despite good faith negotiations the parties cannot reach an agreement on changes to the Accessorial Charges for the one year period commencing on such anniversary, the Accessorial Charges for such one year period shall be the Accessorial Charges effective for the immediately preceding year plus the percentage increase, if any, in the Consumer Price Index for the one-year period immediately prior to the anniversary date on which such proposed increase is to take effect.

(d)  The parties agree that New World and Riviana will pay to Arnold, subsequent to the execution of this Agreement, within thirty (30) days after receipt of an invoice with appropriate back-up materials, the one-time start-up charges described in Exhibit I.

RIV000291

Section 3.4      Invoices.

(a) Invoices shall be prepared by Arnold and shall be payable within thirty (30) days of their receipt by New World or Riviana. Arnold will prepare two separate invoices, one for New World and one for Riviana, each invoice capturing the costs properly allocable to each company's Inventory and other chargeable activities. The Handling Charges that are fixed shall be invoiced on a monthly basis and shall be billed on the first day of each month. The Handling Charges that are variable, as well as the Accessorial Charges, if any, shall be invoiced on a weekly basis.

(b) If New World or Riviana pays any invoice in full within ten (10) days of receipt of such invoice, Arnold shall provide New World or Riviana with a cash discount equal to one percent (1%) of the gross amount of such invoice and New World or Riviana shall be entitled to deduct the amount of such cash discount from such invoice. If New World or Riviana fails to pay an invoice within 60 days of its receipt, a 1% per month interest charge will be assessed to the invoice amount.

(c) If New World or Riviana dispute any invoice (or any part thereof), New World or Riviana shall provide Arnold with written notice of such dispute within thirty (30) days of receipt of such invoice. New World or Riviana shall, however, pay that portion of the invoice not in dispute. If New World or Riviana pay that portion of the invoice not in dispute within ten (10) days of receipt of such invoice, Arnold shall provide New World or Riviana with a cash discount equal to one percent (1%) of that portion of the invoice not in dispute and New World or Riviana shall be entitled to deduct the amount of such cash discount from such invoice.

## ARTICLE IV
## OTHER PROVISIONS

Section 4.1      Indemnification.

(a) Arnold shall indemnify, defend and hold harmless New World and/or Riviana, their parent and affiliated companies, and the directors, officers, employees, agents, contractors, and the successors and/or assigns of all of them, from and against any and all claims, losses, costs, liabilities, interest, expenses and actions at law or in equity (including fines, penalties, and reasonable attorney's fees and disbursements), including but not limited to injury to persons (including death) or damage to property (other than inventory shrinkage as defined and governed by Section 2.7 hereof), arising out of or resulting from the breach of this Agreement by, or willful misconduct or negligent acts or omissions of, Arnold, its agents, employees or contractors; provided, however, that the foregoing indemnification shall not apply to any claim, loss, cost, liability, interest, expense or action is caused in whole or in part by the willful misconduct or negligent acts or omissions of New World and Riviana, its employees, agents or contractors. The provisions of this Section 4.1(a) shall survive the expiration or earlier termination of this Agreement.

(b) New World and Riviana shall indemnify, defend and hold harmless Arnold, its parent and affiliated companies, and the directors, officers, employees, agents, contractors, and the successors and/or assigns of all of them, from and against any and all claims, losses, costs, liabilities, interest, expenses and actions at law or in equity (including fines, penalties, and reasonable attorney's fees and disbursements), including but not limited to injury to persons (including death) or damage to property, arising out of or resulting from the breach of this Agreement by, or willful misconduct or negligent acts and omissions of, New World or Riviana, their agents, employees or contractors; provided, however, that the foregoing indemnification shall not apply to the extent that any claim, loss, cost, liability, interest, expense or action is caused in whole or in part by the negligent acts or omissions Arnold, its employees, agents or contractors. This section shall survive the expiration or earlier termination of this Agreement.

12

RIV000292

Section 4.2      Non- Assignable.

The parties agree that the rights and obligations provided hereunder shall not be assignable to any third party, except that a party shall have the right to assign its rights and obligations hereunder to (i) any subsidiary or affiliate of the party provided that the assigning party shall continue to be liable for the failure of such subsidiary or affiliate to perform the assigning party's obligations hereunder, (ii) any purchaser of all or substantially all of the assets of a party, (iii) any entity which merges or consolidates with the party and (iv) with the consent of the other party(ies), which consent shall not be unreasonably withheld, to any other third party. No permitted assignment shall be effective hereunder unless and until the assignee agrees in writing to be bound by the terms and conditions of this Agreement and delivers an instrument in writing to that effect to the non-assigning party.

Section 4.3      Termination of Agreement.

(a)  This Agreement shall be effective from the Effective Date and, unless (i) terminated earlier pursuant to Sections 4.3(b) or 4.3(c) shall terminate at 11:59 p.m. on December 31, 2012 (hereinafter the "Original Term", with the date of December 31, 2012 being defined as the Expiration Date. Notwithstanding the above, Arnold agrees that New World and Riviana have the option to extend this Agreement for a second five (5) year term, extending through December 31, 2017, at rates and terms to be determined by the provisions of this Agreement, including specifically and without limitation Section 3.3(a) of this Agreement, by providing written notice to such effect to Arnold no later than fifty-two (53) weeks prior to the Expiration Date.

(b)  Notwithstanding the above, either Arnold, or New World and Riviana acting together, may terminate this Agreement immediately upon the other party's default. For purposes of this Agreement, a default shall be deemed to have occurred when the party claiming a default has given written notice to the other party specifying the nature of the default, and such other party shall have failed within ninety (90) days after such notice to cure the condition of default, or, in the event of default incapable of cure within ninety (90) days, shall have failed to commence and complete the cure within a reasonable time under the circumstances. Notwithstanding the foregoing, in the event that New World or Riviana fails to pay any non-disputed Handling Charges, Accessorial Charges or Additional Space Charge due and payable hereunder, it shall be deemed to be in default if, within thirty (30) days following its receipt of notice from Arnold of such non-payment, New World or Riviana fails to pay the amount due. Notwithstanding anything herein to the contrary, a failure to negotiate an agreement with respect to a Revised Compensation Schedule pursuant to Section 3.3(a) shall not be considered a default of this Agreement.

(c)  In addition to the above, New World and Riviana shall have the right to terminate this Agreement at any time during the term of the Agreement, or its extension, in accordance with this Section 4.3(c) upon giving Arnold not less than 90 days prior written notice of its intention to do so following the occurrence of any of the following events (each an "Early Termination Event"): (i) the quality of Arnold's service to either New World or Riviana deteriorates in any material respect; or (ii) Arnold fails to take any actions reasonably requested by New World and Riviana to ensure the long-term cost competitiveness of the Services. Without limiting the above and for the purpose of further explanation only of this Section 4.3(c), Arnold's services shall be deemed to deteriorate in a material respect if any of the events listed on Exhibit G shall occur in relation to New World, or Riviana, considered separately. Upon the occurrence of an Early Termination Event, New World and Riviana may terminate this Agreement without incurring any liability whatsoever upon giving Arnold not less than 90 days prior written notice, which notice shall outline the Early Termination Event and specify a termination date not less than 90 days after the date of notice (the "Early Termination Notice"). If within 30 days after receiving the Early

13

RIV000293

Termination Notice Arnold demonstrates to the reasonable satisfaction of New World and Riviana that Arnold will rectify the causes underlying the Early Termination Notice by a date that is reasonably acceptable to New World and Riviana, provided that such rectification occurs by such date, the right of termination contemplated under this Section 4.3(c) in respect of such Early Termination Event shall be suspended for so long as such rectification continues and this Agreement will continue in accordance with its terms; provided that such suspension shall not prevent New World and Riviana from exercising its termination right under this Section 4.3(c) in respect of any other Early Termination Event.

(d)   In the event that New World and Riviana exercise their rights to terminate this Agreement pursuant to Sections 4.3(b) or (c) of this Agreement, Arnold agrees that New World and Riviana may elect to remain, and have their Inventory remain, in the Warehouse, and in such case: (i) New World and Riviana may engage another third-party entity to provide the Services formerly provided under the terms of this Agreement by Arnold; (ii) New World and Riviana will pay Arnold the contractually agreed to monthly storage cost for the remainder of the contract term for the use of the Warehouse; (iii) Arnold will take such actions as are reasonably necessary so as to continue its lease of the Distribution Center; (iv) the third party entity shall be responsible for any damages to the Warehouse or property as a result of their negligence; (v) a security deposit equal to one full month's storage rent will be required prior to occupation by the third party entity.

(e)   In the event that New World and Riviana exercise their rights to terminate this Agreement pursuant to Sections 4.3(b) of this Agreement, and New World and Riviana do not elect to remain in the Warehouse pursuant to Section 4.3(d) above, it is agreed by the parties that Arnold will bear the costs of moving the Inventory to another location as chosen by New World and Riviana, such costs to include all of the reasonable costs of such move, including but not limited to the costs of handling, packing, transportation, and restocking the Inventory in a new facility and, to the extent that New World and Riviana own the racking in the Warehouse, the costs of rack disassembly, transport and reassembly in a new location, all as completed by suppliers chosen by New World and Riviana ("Move Costs").

In the event that New World and Riviana exercise their rights to terminate this Agreement pursuant to Sections 4.3(c) of this Agreement, and New World and Riviana do not elect to remain in the Warehouse pursuant to Section 4.3(d) above, it is agreed by the parties that all of the Move Costs shall be the responsibility of New World and Riviana.

(f) In the event of termination of this Agreement, if so directed in writing by New World or Riviana, Arnold shall promptly (i) pack and ship any of the Inventory remaining in its possession to a destination directed by New World or Riviana; and (ii) return all documents, records or data which it has in its possession which belong or relate to New World or Riviana, or which contain confidential information of those parties.  In the event of termination of this Agreement due to the expiration of the Agreement by its terms, or due to breach by New World and Riviana, New World and Riviana shall pay applicable Accessorial Charges, if any, arising from Arnold packing and shipping the Inventory to a destination chosen by New World and Riviana.

(g)   Notwithstanding anything to the contrary, this Section 4.3, and Sections 1, 2.6, 2.7, 2.8, 2.11, 4.1, 4.2, 4.4, 4.6, 4.7, 4.8, 4.9 hereto shall survive the expiration or earlier termination of this Agreement.

Section  4.4    Notices.

All notices provided hereunder or which either party is required to give to the other shall be in writing and sent by certified or express mail, postage prepaid or shall be sent by facsimile transmission or by overnight courier (provided evidence of receipt can be verified) to the following address, or to any other addresses which either party may designate to the other in writing:

14

RIV000294

**NEW WORLD PASTA COMPANY**

New World Pasta Company
85 Shannon Rd.
Harrisburg, PA 17112
Fax: 717-526-2271
Attention: Michael Harrison
Director, Distribution

With a copy to:
New World Pasta Company
85 Shannon Rd.
Harrisburg, PA 17112
Fax: 717-526-2488
Attention: Cary A. Metz
General Counsel

**RIVIANA FOODS INC.**

Riviana Foods Inc.
2777 Allen Parkway
Houston, Texas 77019
Fax: 713-525-9512
Attention: Terry Nickens
Distribution Manager

With a copy to:
Riviana Foods Inc.
2777 Allen Parkway
Houston, Texas 77019
Fax: 713-942-1840
Attention: Elizabeth B. Woodard
General Counsel

**ARNOLD LOGISTICS:**

Arnold Logistics, LLC
4410 Industrial Park Road
Camp Hill, PA 17011
Attention: Douglas B. Enck, President
Facsimile #: 717-730-5214

Section 4.5     Modification.

This Agreement may not be altered or varied except by a written instrument signed by all parties.

Section 4.6     Governing Law.

This Agreement shall be interpreted and enforced in accordance with the laws of the Commonwealth of Pennsylvania.

15

RIV000295

Section 4.7    Entire Agreement.

This Agreement contains the entire agreement among the parties and supersedes any prior or contemporaneous written or oral agreements by and among the parties hereto relating to the subject matter hereof. Any agreement hereafter made shall be ineffective to change, modify or discharge this Agreement in whole or in part unless such agreement is in writing and signed by all of the parties hereto.

Section 4.8    Binding Effect.

This Agreement shall be binding upon, and the benefits hereof shall inure to, the parties and their respective successors in interest.

Section 4.9    Confidential Information.

New World and Riviana acknowledge that material and information which New World and Riviana may acquire about Arnold's inventory management software programs, staffing methods, financial or other accounting systems and Arnold's other procedures and processes relating to the Services being provided hereunder are considered by Arnold to be proprietary and confidential. Arnold acknowledges that material and information which Arnold may acquire about the Inventory, New World and Riviana's products, volume, customers, pricing and procedures and processes are considered by New World and Riviana to be proprietary and confidential. Each party agrees that all such information acquired by the other parties hereunder shall be held in confidence during the term of this Agreement and for a period of two (2) years following the termination or expiration of this Agreement and, during such periods, each party shall not reveal or use any such information without the other party's prior written consent, provided that each party may disclose such information or material only to those who have reasonable need to know the same in connection with the performance of this Agreement. No party shall have any obligation, however, to preserve the confidentiality of any such information which: (i) is in the public domain or generally available to the public; or (ii) was in the possession of or disclosed to the other parties prior to the date hereof, free of any obligation to keep the same confidential; or (iii) is lawfully acquired by the other from a third party which to the knowledge of the receiving party is under no obligation or confidence to the other parties; or (iv) which a party is obligated under law or court order to disclose.

Section 4.10    Force Majeure.

No party shall be liable to the other for failure to perform its obligations under this Agreement if prevented from doing so because of an act of God, fire, flood, explosion, civil disturbance, interference by civil or military authority, war, terrorism, accident, or because the continuation of the Services at the Warehouse would be in violation of any future governmental laws, rules or regulations or would cause or create any material safety, health or environmental concerns or for other causes beyond the reasonable control of the party and not intentionally caused by such party (collectively "Force Majeure"); provided, however, that in no event shall any labor strike, dispute or shortage constitute a Force Majeure event. Upon the occurrence of a Force Majeure event, the party seeking to rely on this provision shall promptly give written notice to the other party of the nature and consequence of the cause. Each party shall use all reasonable efforts to minimize the effects of a Force Majeure event. If a Force Majeure event occurs with respect to any of the services or obligations of the parties under this Agreement and such Force Majeure event is estimated to last beyond a period of time so that a parties' obligations or services are materially disrupted, subject to the penultimate sentence of this Section, the parties shall agree as to alternative temporary arrangements, the temporary cessation of services and/or obligations or the termination of this Agreement. During the period of any Force Majeure, the Services and the compensation for the same shall be equitably adjusted, it being understood that New World and Riviana shall have no obligation to pay any fees to Arnold during such period if Arnold does not provide any of the Services during such period; provided that the foregoing hereof shall not apply to monetary amounts due or owing by either party to the other prior to the

16

Force Majeure period. If any Force Majeure event with respect to the Distribution Center occurs (such as partial or total destruction to the Distribution Center by fire or other casualty), and the Inventory (or a significant portion thereof) is no longer capable of being stored or preserved at the Warehouse (whether temporarily or permanently), (i) New World and Riviana may elect to terminate this Agreement upon giving notice in writing to Arnold and (ii) if New World and Riviana do not elect to terminate this Agreement, New World and Riviana shall not unreasonably withhold its consent to move the Inventory to a temporary storage location at which the Services shall thereafter be provided until the Warehouse can once again be used for the providing of the Services. The cost and expense of (i) transporting the Inventory from the Warehouse to the alternate storage location, (ii) transporting the Inventory back to the Warehouse from the temporary storage location at the cessation of the Force Majeure event and (iii) the rent and other operating expenses associated with an alternate storage location shall be paid for by Arnold.

.

RIV000297

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, through their duly authorized officers, the day and year first above written.

ARNOLD LOGISTICS, LLC

By:_____
Name:
Title:

NEW WORLD PASTA COMPANY

By:_____
Name:
Title:

RIVIANA FOODS INC.

By:_____
Name:
Title:

18

RIV000298

JUL/20/2007/FRI 08:17 AM                                                    P 002

NWP/RF SIGNATURE PAGE

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, through their duly
authorized officers, the day and year first above written.

ARNOLD LOGISTICS, LLC

By:
Name: Project T  CEO
Title:

NEW WORLD PASTA COMPANY

By:
Name: CHAN ALBERT
Title: SVP

RIVIANA FOODS INC.

By:
Name: STEPHEN K ISAACSON
Title: VP - MANUFACTURING

RIV000299

## List of Exhibits

Exhibit A...........................................     Key Performance Indicator Schedule

Exhibit B...........................................     Account Profile Information Schedule

Exhibit C...........................................     Compensation Schedule

Exhibit D...........................................     Operating Budget Assumptions

Exhibit "TBD"...................................Request for Quotation

Exhibit E...........................................     Product Profile

Exhibit F...........................................     Scope of Services

Exhibit G...........................................     Service Deterioration

Exhibit H...........................................     Sanitation Audit Report

**Exhibit I............................. ......... .......     One Time Start-Up Costs**

**Exhibit J ............................................. Integrated Pest Control Management Program**

**Exhibit K ....................................... ....Trailer Seal Policy**

Exhibit W.........................................Warehouse Outline

RIV000300

Exhibit A – Key Performance Indicator Schedule[1]
*As Applicable to New World Inventory*

| Key Performance Indicator | Further Description |
|---|---|
| Cost per Hundred Weight | Total Cost/ (the sum of inbound & outbound cwt divided by 2) |
| Cost per Case | Total Cost/ (the sum of inbound & outbound cases divided by 2) |
| Cost per Pallet | Total Cost/(the sum of inbound & outbound pallets divided by 2) |
| Direct Labor Hours | Total hours to service the New World account |
| Administrative/Non-Direct Hours | Total hours to service the New World account |
| Direct Labor Pounds | Total pounds of New World product to go through the warehouse |
| Productivity Measures | Cubes (pallets) per hour for loading, putaway, and unloading |
| Picking Productivity | Miscellaneous cases picked per hour & Full pallet picking per hour |
| Inventory on Hand | Total cases in the warehouse at the end of the month |
| Product on Hold | Total cases on hold at the end of the month |
| Space Utilization Percentage | Percentage of the contracted space which is utilized by the existing inventory |
| Regrind Cases | Total cases of regrind material on hand at the end of the month |
| Inbound Damage | Total cases which are damaged when they are delivered, **reported by mode of delivery** |
| Return Damage | Total cases which are damaged when they are returned |
| House Damage | Total of cases which are damaged by Arnold in the warehouse |
| Cases Dumped | Total cases which are dumped in each month |
| On Time Loading | Percentage of **trucks (containers, piggybacks, boxcars, etc.)** which are loaded within the required timeframe |
| On time delivery - day | Percentage of carriers which deliver on the scheduled day |
| On time delivery - minute | Percentage of carriers which deliver within the required timeframe |
| Inbound Discrepancies | Percentage of orders delivered which have discrepancies with the bill of lading |
| Inbound Discrepancies by Shipping Locations | Distribution percentage of the inbound discrepancies |
| Average Weight per Case Received | Total inbound weight by pounds received divided by the number of cases |
| Cases/pallets | Total cases received **divided by total pallets received** |

---

[1] Subject to revision by New World.

RIV000301

Exhibit A – Key Performance Indicator Schedule[2]
*As Applicable to Riviana Inventory*

| Key Performance Indicator | Further Description |
|---|---|
| Cost per Hundred Weight | Total Cost/ (the sum of inbound & outbound cwt divided by 2) |
| Cost per Case | Total Cost/ (the sum of inbound & outbound cases divided by 2) |
| Cost per Pallet | Total Cost /(the sum of inbound & outbound pallets divided by 2) |
| Direct Labor Hours | Total hours to service the **Riviana** account |
| Administrative/Non-Direct Hours | **Total hours to service the Riviana account** |
| Direct Labor CWT | **Total CWT of Riviana product to go through the warehouse** |
| Productivity Measures | Cubes (pallets) per hour for loading, putaway, and unloading |
| Picking Productivity | Miscellaneous cases picked per hour & Full pallet picking per hour |
| Inventory on Hand | Total cases in the warehouse at the end of the month |
| Product on Hold | Total cases on hold at the end of the month |
| Space Utilization Percentage | Percentage of the contracted space which is utilized by the existing inventory |
| Rework Cases | Total cases of rework material on hand at the end of the month |
| Inbound Damage | Total cases which are damaged when they are delivered, **reported by mode of delivery** |
| Return Damage | Total cases which are damaged when they are returned |
| House Damage | Total of cases which are damaged by Arnold in the warehouse |
| Cases Dumped | Total cases which are dumped in each month |
| On Time Loading | Percentage of **trucks (containers, piggybacks, boxcars, etc.)** which are loaded within the required timeframe |
| On time delivery – day | Percentage of carriers which deliver on the scheduled day |
| On time delivery – minute | Percentage of carriers which deliver within the required timeframe |
| Inbound Discrepancies | Percentage of orders delivered which have discrepancies with the bill of lading |
| Inbound Discrepancies by Shipping Locations | Distribution percentage of the inbound discrepancies |
| Average Weight per Case Received | Total inbound weight by pounds received divided by the number of cases |
| Cases/Pallets | Total cases received **divided by total pallets received** |

---

[2] Subject to revision by Riviana.

RIV000302

Exhibit B – Account Profile Information Schedule
*As Applicable to New World Pasta*

| Account Profile Measure | Further Description |
|---|---|
| Inventory Control | Accuracy of Bay Counts and Cycle Counts |
| Inbound Volume | Tracked for the month, cases received, **trucks (containers, piggybacks, boxcars, etc.)** received, and inbound weight by pounds received |
| Outbound Volume | Tracked for the month, cases shipped, orders shipped, and outbound weight shipped |
| Through Put Volume | Equals inbound received plus outbound shipped, the sum of which is divided by 2, and is reported each month by both cases and weight. |

RIV000303

Exhibit B – Account Profile Information Schedule
*As Applicable to Riviana Foods*

| Account Profile Measure | Further Description |
|---|---|
| Inventory Control | Accuracy of Bay Counts and Cycle Counts |
| Inbound Volume | Tracked for the month, cases received, **trucks (containers, piggybacks, boxcars, etc.)** received, and inbound weight by pounds received |
| Outbound Volume | Tracked for the month, cases shipped, orders shipped, and outbound weight shipped |
| Through Put Volume | Equals inbound received plus outbound shipped, the sum of which is divided by 2, and is reported each month by both cases and weight. |

23

RIV000304

**Exhibit C – Compensation Schedule**
*As Applicable to New World Pasta*

**Accessorial and Overtime Charges (New World Pasta)**

1.  RECOUP CHARGE:  $1.50  per case for other than damages caused by Arnold.

2.  LABELING/HANDSTACKING:  $.11per carton.

3.  PARCEL LABELING:  $.11 per carton.

4.  Stacking $.16/case

5.  KIT RATES:  TBD

6.  PALLET TRANSFER:  $ .50 per pallet switch.

7.  QA INSPECTION RATE:  To be billed on a per hour basis at $25.00/hour.

**Overtime (Pre-Approved by Client)**

| | | |
|---|---|---|
| Weekday and Saturday | 150% | Applicable handling rates |
| Sunday and Holidays | 200% | Applicable handling rates |
| **Additional Handling (Pre-Approved by Client)** | $25.00 | Per Labor hour |

24

RIV000305

## Exhibit C – Compensation Schedule: As Applicable to New World Pasta

**Handling Fees** (through expiration date)

| | Rates |
|---|---|
| Pallet in (NWP) | $ 1.95 dollars/pallet |
| Pallet in Slip X-Fer (NWP) | 0.500 dollars/slip x-fer |
| Pallet Out (NWP) | 2.000 dollars/pallet |
| Loose Case Pick (NWP) | 0.161 dollars/case |

**Management Fee** (through expiration date)

$46,086.66 per month

**Storage Costs**

Based on 216,500 quare feet
There are 2 components of storage costs – Fixed and Variable

**Fixed Storage Cost – Frozen through Expiration Date**

| | Annual $/sq. ft. | Monthly $/sq. ft. | Annual Cost | Monthly Cost |
|---|---|---|---|---|
| Rent $/sq. ft. annually | $ 3.41 | $ 0.2842 | $ 738,265.00 | $ 61,522.08 |
| Other | 0.44 | 0.0367 | 95,260.00 | 7,938.33 |
| Margin | 0.50 | 0.0417 | 108,250.00 | 9,020.83 |
| **Sub Total** | $ 4.35 | $ 0.3625 | $ 941,775.00 | $ 78,481.25 |

**Variable Storage Costs - Floating**

| | Annual $/sq. ft. | Monthly $/sq. ft. | Annual Cost | Monthly Cost |
|---|---|---|---|---|
| Utilities | $ 0.49 | $ 0.0408 | $ 106,085.00 | $ 8,840.42 |
| Building Support (Trash, cleaning, snow, pest) | 0.05 | 0.0042 | 10,825.00 | 902.08 |
| Building Repairs and Maintenance | 0.12 | 0.0100 | 25,980.00 | 2,165.00 |
| Security | -- | -- | -- | -- |
| Building Insurance | 0.04 | 0.0033 | 8,660.00 | 721.67 |
| Depreciation (Leasehold Improve.) | -- | -- | -- | -- |
| Real Estate Taxes | 0.49 | 0.0408 | 106,085.00 | 8,840.42 |
| **Sub Total** | $ 1.19 | $ 0.0992 | $ 257,635.00 | $ 21,469.58 |
| **Total Storage Costs** | | | **$ 1,199,410.00** | **$ 99,950.83** |

The Fixed Storage Costs - Frozen will not change during the period from the Effective Date through the Expiration Date. The Variable Storage Costs - Floating, as set forth above, shall not change for the period from the Effective Date through December 31, 2008. Effective January 1 of each year beginning on January 1, 2009, Arnold may increase, on an element by element basis, the charges to New World or Riviana which are elements of the Variable Storage Costs - Floating, up to the increase, if any, actually experienced by Arnold for such element, as applicable to New World or Riviana, during the prior twelve (12) month period, except that each such component increase may not exceed the percentage increase, if any, of the Consumer Price Index for the one-year period immediately prior to the applicable January 1 anniversary date.

RIV000306

**Exhibit C – Compensation Schedule**
*As Applicable to Riviana Foods*

**Accessorial and Overtime Charges (Riviana)**

1. RECOUP CHARGE: $1.50 per case for other than damages caused by Arnold.

2. LABELING/HANDSTACKING: $.11per carton.

3. PARCEL LABELING: $.11 per carton.

4. Stacking $.16/case

5. KIT RATES: TBD

6. PALLET TRANSFER: $ .50 per pallet switch.

7. QA INSPECTION RATE: To be billed on a per hour basis at $25.00/hour___.

**Overtime (Pre-Approved by Client)**

| | | |
|---|---|---|
| Weekday and Saturday | 150% | Applicable handling rates |
| Sunday and Holidays | 200% | Applicable handling rates |

| | | |
|---|---|---|
| **Additional Handling (Pre-Approved by Client)** | $25.00 | Per Labor hour |

RIV000307

## Exhibit C – Compensation Schedule
*As Applicable to Riviana Foods*

**Handling Fees** (through expiration date)

| | Rates |
|---|---|
| Pallet in (RVR-Truck) | $ 2.08 dollars/pallet |
| Pallet in Slip X-Fer (RVR) | 0.50 dollars/slip x-fer |
| Pallet in (RVR Rail) | $2.20 dollars /pallet |
| Pallet Out (RVR) | 2.08 dollars/pallet |
| Loose Case Pick (RVR) | 0.28 dollars/case |

**Management Fee** (through expiration date)

$48,289 per month

Note: After the Original Term, Riviana to retain ownership of case pick rollers

**Storage Costs**

Based on 175,000 quare feet
There are 2 components of storage costs – Fixed and Variable

**Fixed Storage Cost – Frozen through Expiration Date**

| | Annual $/sq. ft. | Monthly $/sq. ft. | Annual Cost | Monthly Cost |
|---|---|---|---|---|
| Rent $/sq. ft. annually | $ 3.41 | $ 0.2842 | $ 596,750.00 | $ 49,729.17 |
| Other | 0.44 | 0.0367 | 77,000.00 | 6,416.67 |
| Margin | 0.50 | 0.0417 | 87,500.00 | 7,291.67 |
| **Sub Total** | $ 4.35 | $ 0.3625 | $ 761,250.00 | $ 63,437.50 |

**Variable Storage Costs - Floating**

| | Annual $/sq. ft. | Monthly $/sq. ft. | Annual Cost | Monthly Cost |
|---|---|---|---|---|
| Utilities | $ 0.49 | $ 0.0408 | $ 85,750.00 | $ 7,145.83 |
| Building Support (Trash, cleaning, snow, pest) | 0.05 | 0.0042 | 8,750.00 | 729.17 |
| Building Repairs and Maint. | 0.12 | 0.0100 | 21,000.00 | 1,750.00 |
| Security | -- | -- | -- | -- |
| Building Insurance | 0.04 | 0.0033 | 7,000.00 | 583.33 |
| Depreciation (Leasehold Improvement) | -- | -- | -- | -- |
| Real Estate Taxes | 0.49 | 0.0408 | 85,750.00 | 7,145.83 |
| **Sub Total** | $ 1.19 | $ 0.0992 | $ 208,250.00 | $ 17,354.17 |
| **Total Storage Costs** | | | **$ 969,500.00** | **$ 80,791.67** |

The Fixed Storage Costs - Frozen will not change during the period from the Effective Date through the Expiration Date. The Variable Storage Costs - Floating, as set forth above, shall not change for the period from the Effective Date through December 31, 2008. Effective January 1 of each year beginning on January 1, 2009, Arnold may increase, on an element by element basis, the charges to New World or Riviana which are elements of the Variable Storage Costs - Floating, up to the increase, if any, actually experienced by Arnold for such element, as applicable to New World or Riviana, during the prior twelve (12) month period, except that each such component increase may not exceed the percentage increase, if any, of the Consumer Price Index for the one-year period immediately prior to the applicable January 1 anniversary date.

RIV000308

## Exhibit D – Operating Budget Assumptions
*As Applicable To New World Pasta*

| | |
|---|---|
| Square Footage | 216,500 |
| Annual Inventory Turns | 10.52 |
| Number of customer order per day | 28.5 |
| Total SKU's in inventory | 372 |
| Percentage of product received on pallets | 97% |
| Average Pallets in inventory | 23078 |
| Average cases per pallet | 47 |
| Average pounds per case | 16.75 |
| Bulk stack height for product storage | 1 |
| Number of rack positions provided | 27000 |
| Average line per order | 15 |
| Average cases per order | 1588 |
| Average cases per line | 106 |
| Number of Sku's per receipt | 7 |
| Rotation method | FIFO 30 days |
| Number of code dates per pallet-inbound | 1 |
| Average order lead time in days | 5 |
| Percentage of order in full pallet quantities | 87% |
| Percentage of order that is cases picked | 13% |
| Number of inbound pallets per year | 242708 |
| Percentage of customer pickup | 20 |
| Operating days | 355 |
| Hours of Operation | 5 x 24 2 x 10 |
| Productivity rate-unload | 54 truck pallet/40 slip pallet |
| Productivity rate-putaway | 28 |
| Productivity rate-pallet pick | 26 |
| Productivity rate-case pick | 345 |
| Productivity rate-replenishment | 18 |
| Productivity rate-load trucks | 44 |
| Annual throughput of cases | 11407268 |

28

RIV000309

## Exhibit D – Operating Budget Assumptions
*As Applicable To Riviana*

| | |
|---|---|
| Square Footage | 175,000 |
| Annual Inventory Turns | 8.99 |
| Number of customer order per day | 23.8 |
| Total SKU's in inventory | 520 |
| Percentage of product received on pallets | 58% |
| Average Pallets in inventory | 13,000 |
| Average cases per pallet | 50/46 |
| Average pounds per case | 29.96 |
| Bulk stack height for product storage | Sku dependent |
| Number of rack positions provided | 14,000 plus 3,000 pallets in "dead-pile" |
| Average line per order | 8 |
| Average cases per order | 967 |
| Average cases per line | 121 |
| Number of Sku's per receipt | 7 truck / 3 rail |
| Rotation method | FIFO - Day |
| Number of code dates per pallet-inbound | 1 |
| Average order lead time in days | 5 |
| Percentage of order in full pallet quantities | 75% |
| Percentage of order that is cases picked | 25% |
| Number of inbound pallets per year | 134,207 |
| Percentage of customer pickup | Unknown at this time |
| Operating days | 250 |
| Hours of Operation | 5 x 8 |
| Productivity rate-unload | 36 truck /30 rail |
| Productivity rate-putaway | 26 |
| Productivity rate-pallet pick | 26 |
| Productivity rate-case pick | 135 |
| Productivity rate-replenishment | 16 |
| Productivity rate-load trucks | 36 |
| Annual throughput of cases | 5,806,290 |

RIV000310

<u>Exhibit E – Product Profile</u>

All of New World and Riviana's products stored at Arnold's facility will be pasta, rice or other food products, packaging materials and related items. Product tendered to Arnold for warehousing and distribution will not require temperature or humidity controlled storage.

RIV000311

Exhibit F – Scope of Services

Scope of Services:  The scope of the services (hereinafter "Services") is set forth below, and shall be **incorporated in a procedure manual to be developed jointly and mutually agreed upon by the parties.** The manual more specifically defines the standard operating procedures used to perform the functions outlined as within the scope of services.

**Services within Scope of Services**

**Warehousing**
- Receipt/unloading
- Put Away
- Picking
- Freight planning including order consolidation
- Shipping/Loading
- Stock Rotation
- Physical Inventories
- Cycle Counting
- Product trace

**Site Administration and Management**
- Workforce supervision (Includes hiring and resource allocation)
- Human Resource policy and procedure administration
- Financial Accounting
- Productivity Monitoring and Reporting
- Governmental and Regulatory Compliance
- Security of site and contents
- Equipment and Facility Maintenance (including racking  owned by New World and Riviana)
- Inbound and Outbound Dock Scheduling
- Maintenance of insurance
- Freight management and consolidation

**Reporting**
- EDI transaction sets will be successfully sent at agreed upon times
- Productivity reports will be shared for receiving, putaway, picking and loading and other operating functions.
- Reporting of On Time Shipping
- Chep and pallet Accounting

**Services outside the Scope of Services**

31

RIV000312

- Copacking/Display Building
- Product Customization (e.g. labeling/pallet pattern conversions/stenciling)
- Pallet Conversion (to or from Chep)
- Holiday Work Requests
- Damage Repackaging/Recouping
- Loading/Unloading of trailers to or from overflow sites. This will be charged at the agreed upon handling rate.

Except as noted herein, if New World or Riviana requests any services that are outside the Scope of Services, any agreed upon services shall be invoiced, unless otherwise agreed to by the parties, as Accessorial Charges, as provided in Exhibit C.

**Inventory Management System**: The inventory management system that will be utilized is the Bluegrass System.

**Railroad Service**
- Arnold shall maintain railroad service into and out of the Warehouse. In addition, Arnold will at their expense, maintain at standards acceptable to the railroad, sufficient rail track necessary to allow the railroad to switch cars in normal rail operations into and out of the Distribution Center.

32

RIV000313

Exhibit G – Service Deterioration

For purposes of Section 4.3(c) of this Agreement, Arnold's service shall be deemed to have deteriorated in a material respect if any of the events in the table below shall occur in relation to either New World or Riviana, considered separately or alternatively, considered together:

| Event Title | Event Description |
|---|---|
| 95% On Time Loading | if, in any two consecutive months, less than 95% of outbound delivery trucks (**containers, piggybacks, boxcars, etc.) (New World and Riviana contracted delivery carriers and/or New World and Riviana's customer self-delivery trucks (containers, piggybacks, boxcars, etc.))** are not loaded within two hours of their arrival at the Distribution Center. Arnold is not liable for loading performance for carrier's arriving 15 minutes or later than schedule or any carrier arriving without an appointment. |
| Sanitation Audit Rating of 94 | if Arnold receives a sanitation audit rating score of less than or equal to 94 on any two consecutive warehouse Sanitation Audit Reports (substantially in the form attached hereto as Exhibit H and which may be revised from time to time by New World and Riviana) completed by New World and Riviana pursuant to its inspection of the Warehouse in accordance with Section 2.4(b). |
| 97% Bay Status Accuracy | if, in any two consecutive months, scheduled inventory counts performed at the bay level, comparing the total number of cases posted to Arnold's WMS for all bay's counted, to all cases physically verified is less than 97% when calculated on a Net basis. |
| 97% Cycle Count Accuracy | if, in any two consecutive months, scheduled inventory counts performed at the SKU level, comparing the total number of cases posted to Arnold's WMS for all SKU's counted, to all cases physically verified is less than 97% when calculated on a Net basis. |
| Physical Count Inventory Accuracy | if the actual count of Inventory determined by the physical inventories or cycle counts taken at the Warehouse (pursuant to Section 2.7) is not within one-half percent (.5%) of the total Inventory balances jointly agreed to by the parties (pursuant to Section 2.7). |

RIV000314

<u>Exhibit H – Sanitation Audit Report</u>

**NEW WORLD AND RIVIANA
WAREHOUSE SANITATION / FOOD SAFETY
EVALUATION**

**AUDIT REPORT NO.**

Name:     Arnold Logistics Warehouse                 Inspection Date:
Address:
City/State/Zip: New Kingston PA                      Inspectors:
Phone:

Manager of Facility: Russ Scheid                     Previous Inspection Date:
                                                     Previous Inspector:
Others Contacted during Inspection:

                                                     Previous Rating

**Evaluation of Facility: Score __**

| | |
|---|---|
| **Excellent** | **95.5 - 100** |
| Good | 84.5-95.4 |
| Fair | 70.5 - 84.4 |
| Unacceptable | 70.4 & Below |

**Executive Summary:**

The overall condition of the warehouse as noted in the above rating was _____.

**Recommended Inspection Frequency:**_____

**Types of Products Handled:**

copy:

34

RIV000315

| Points Assigned | A. | GROUNDS/EXTERIOR OF FACILITY | YES or NO | Points Received |
|---|---|---|---|---|
| 3 | 1. | Do the loading docks use dock levelers? *If yes, answer a, b, c, and d.* | | |
| | | *Place N/A (not applicable) if no dock levelers and back 3 points out of total score for category.* | | |
| | | a. Are the areas beneath dock leveler plates free of trash, spilled product, broken product containers, etc.? | | |
| | | b. Are these areas cleaned regularly? | | |
| | | c. With what frequency? | | |
| | | d. Are dock levelers properly sealed? | | |
| 2 | 2. | Do all dock doors have cushioned buffers to seal against trucks (containers, piggybacks, etc.) ? | | |
| 2 | 3. | Are the exterior walls free of high weeds, derelict equipment, pallets, trash, or other potential rodent harborage areas? If no, explain : | | |
| 2 | 4. | Are the grounds properly sloped to prevent water from accumulating stagnant pools? | | |
| 2 | 5. | Are all accesses into the building properly screened? (i.e. exhaust vents, pipes ) | | |
| 2 | 6. | Are the outer walls and wall/roof joints solid, without breaks? | | |
| 1 | 7. | Are personnel doors self-closing? | | |
| 1 | 8. | Can the conditions of the adjacent properties create potential problems for the warehouse? If yes, explain: | | |
| 1 | 9. | Is the trash dumpster lid kept closed when not in use? Can it be locked? *(only important if facility is not secured from pedestrians)* | | |
| 2 | 10. | Are exterior lights mounted against the warehouse so that they may attract insects towards the building? | | |
| | | a. What type of lighting is used? please *underline.* | | |
| | | Sodium vapor, Mercury, Fluorescent, Incandescent | | |
| N/A | 11. | What is the composition of the exterior grounds? (i.e. dirt, gravel, asphalt, concrete, landscape, etc.) | | |
| | | North Side:    Macadam dock and pad area asphalt | | |
| | | South Side:   3 feet of stone – grass lawn well maintained | | |

35

RIV000316

East Side:    SAME

West Side:    SAME

N/A    12.    Should consideration be given to securing a 12-inch wide, smooth surface beneath each dock door as a rodent barrier?

| Points Assigned | B. | INTERIOR OF FACILITY - STRUCTURAL CONSIDERATIONS | YES or NO | Points Received |
|---|---|---|---|---|
| 4 | 1. | Are doors properly rodent-proof? If no, specify locations or door numbers. | | |
| 4 | 2. | Is there any evidence of roof leaks? | | |
| 4 | 3. | Are walls, floors, and ceilings in good repair (free of cracks, voids, loose paint, damaged insulation, etc.), including wall/floor junctures and floor expansion joints ? If no, explain: | | |
| 3 | 4. | Do doors remain open only when in use? | | |
| 1 | 5. | Is the lighting sufficient to achieve satisfactory sanitation requirements? | | |
| 1 | 6. | Are the lights adequately protected? (particularly pick areas) | | |
| 1 | 7. | Is there adequate ventilation? | | |
| 2 | 8. | Are windows closed or screened, weather tight and pest proof ? *(if there are no windows, back out 2 points)* | | |
| N/A | 9. | Were there any structural improvements made to the building over the past year other than routine maintenance work? If yes, specify: | | |

| Points Available | C. | HOUSEKEEPING AND QUALITY CONSIDERATIONS | | |
|---|---|---|---|---|
| | 1. | Are damaged or returned goods stored in an isolated section of the warehouse? If so, please describe: | | |
| 2 | | On average, within what time frame is damaged stock reconditioned or destroyed? | | |
| 3 | 2. | Are there any incompatible materials stored above or in close proximity to NWP products? (toxic, odor-emitting, pet food etc.) If yes, explain: | | |
| 4 | 3. | Do employees' actions conform with Good Manufacturing Practices? | | |

    a.    Evidence of employees smoking or chewing tobacco.

    b.    Evidence of eating and/or drinking in storage areas.

    c. Evidence of employees walking on top of finished product cases.

    d. Are employee sanitary facilities clean and easily accessible with hot water, soap, and towels?

    e.    Are hand washing signs posted?

4    4.    Are the storage areas clean and free of dirt, debris, product spillage, etc.?

36

RIV000317

If no, specify:

3          5.    Is all stock on pallets or in some manner separated from direct contact with the floor?

3          6.    Are the pallets clean, free of insect infestation or rodent droppings, and in good condition (dry, seasoned wood)?

3          7.    Is all stock stored 18 inches from walls and pillars?  If no, please specify the location:

3          8.    If racks are used for storage, are support legs clean and free of insects, webbing, dirt, product spillage, etc.?  If no, specify:

3          9.    Is all stock stored away from heat sources such as steam pipes, room heaters and direct sunlight?

3          10.   Were there carriers present during this audit?  Were they clean and free of leaks, extruding nails, odors, etc. with seals being used?  If no, _specify:_

3          11.   Were there any loading practices cited that might result in damage or contamination of finished products? *(heavy cases or display cases placed on top of lighter cases; slipsheets misaligned, pallets lacking stretch-wrap or incompatible products on carrier)* If so, please_explain:_

1          12.   Are trash receptacles covered to reduce the attraction of flying insects?

1          13.   Are forklifts clean and free of dirt, debris, product spillage, etc.?

1          14.   Are utility rooms, offices, and miscellaneous storage areas clean and free of debris, clutter ?

**Points Available**     **D.    PEST CONTROL**

4          1.    Were areas free of rodent activity?  If no,_describe._

4          2.    Was there any evidence of insect activity?  If yes, _specify_ the significance of findings.

2          3.    Was there evidence of bird roosting or nesting along the exterior ?

\*\*\*\*\*\*\*\*     4.    Were all _interior_ areas free of nesting birds, and/or rodent or insect activity?  If no, specify:

*A no answer to this question results in an automatic unacceptable rating regardless of calculated score.*

N/A        5.    Who is responsible for the pest control program at this facility?

NAME(S):
Are they properly licensed?

If an outside service is contracted, a copy of the pest control operator's license and insurance information must be kept on file.

37

RIV000318

If an outside service is contracted, does the warehouse use in-house personnel to monitor the traps between visits ?

3        6.    Does a formal pest control manual accompany this service?

              Does it include:

              • records of pesticide applications after each service including: names, concentrations, amount applied, date applied, target pest,  method of application and findings during inspection.;

              • current labels and Material Safety Data Sheets for the pesticides used?
                            a map indicating rodent and insect trap(s) placement ?

              •  Do any adjustments need to be made to these records ?
                 If yes, specify:

3        7.    Describe rodent control program

              • Interior Rodent control:

                    Control measures ( ketch-alls, glueboards, etc.):

                    How often are traps checked?

                    Sufficient number:   (If no, please explain)

              • Exterior rodent control:

                    Control measures:

                    If bait stations are used, are they anchored & secured ?

                    How often are traps checked?
                    Sufficient number?  (If no, please explain)
                    Type of Bait: wax block

2        8.    Describe insect control program.

              Controls Used:

              Pesticide Names, if applicable:

              Frequency of inspection:

2        9.    If pest control supplies are stored on sight, are they stored and used in a manner to preclude product contamination ?

1        10.   If applicable,  please describe the weed control program?

**Points**    **E.    PROCEDURES**
**Available**
2        1.    Are inventory records maintained to facilitate identification and return of stock from  customers in case of a recall and is there a formal, documented recall procedure ?
              Describe:

38

RIV000319

| | | |
|---|---|---|
| 3 | 2. | Is a master sanitation schedule in place and documented, particularly for hard-to-reach areas such as under racks, beneath dock pits, around rack support legs, etc. ? . |
| 2 | 3. | Are the proper coding practices used when repacking finished goods? |
| 1 | 4. | Is the aged inventory report issued monthly with proper follow-up undertaken? |
| 2 | 5. | Are rotation audits conducted periodically? If so, with what frequency? |
| 2 | 6. | Do new employees receive an orientation program that defines internal policies, procedures, responsibilities and Good Manufacturing Practices ? If yes, describe: Is it reviewed at least annually? |
| 2 | 7. | What procedure is used to identify and isolate materials still in your control, but that have been placed on HOLD? |
| 2 | 8. | Are carriers inspected before loading & unloading and records maintained to document unacceptable conditions ? |
| 1 | 9. | How are out-of-tolerance conditions communicated to suppliers? |
| 1 | 10. | How do you dispose of unsalable product? |
| 1 | 11. | Are housekeeping and GMP inspections conducted and documented internally?  If yes, how often? |
| 1 | 12. | Are regulatory inspections kept on file ? |

| SECTIONS | MAX POINTS POSSIBLE | POINTS EARNED | % OF TOTAL | WEIGHTED VALUE | TOTAL |
|---|---|---|---|---|---|
| Exterior/Ground | 18 | | | 0.10 | |
| Interior/Grounds | 20 | | | 0.20 | |
| Housekeeping | 37 | | | 0.35 | |
| Pest Control | 21 | | | 0.25 | |
| Procedures | 20 | | | 0.10 | |
| | | | | TOTAL | |

39

RIV000320

Exhibit I – One-Time Start Up Costs

| Start Up Costs | New World Total | Riviana Total |
|---|---|---|
| EDI Set up | $ 52,500 | $ 46,200 |
| Moving Costs – Transportation | | |
| Moving Costs – Handling | | |
| Training and Traveling | 38,685 | 58,028 |
| Other One Time Start Up Costs (1) | 18,375 | 18,375 |
| Other One Time Start Up Costs (2) | 25,448 | 25,448 |
| Other One Time Start Up Costs (3) | | |
| Other One Time Start Up Costs (4) | | |
| Margin | | |
| Total Start Up Costs | $135,008 | $148,050 |

Other: (1) – WMS Corporate Trainer and Programmer Support @ Start Up

(2) – Costs Associated with Facility Preparation (0.13 / sq. ft.)

40

RIV000321

## Exhibit J – Integrated Pest Control Management Program

The Arnold Logistics Pest Control program is managed by the Corporate Quality Control Manager. The performance of the process has been contracted to The Industrial Fumigant Co. Inc. IFC is a nationally recognized company with corporate HQ in Manhattan, KS. A document control binder is prepared by IFC and is kept on file in the QA Department. The binder includes maps depicting the location and number of each trap (interior) and bait station (exterior), copies of the applicator's license, insurance certificate, MSDA sheets and contracts. The binder is audited by the IFC Corporate office two times each year. In addition to the standard pest control preparation, each employee receives GMP training upon orientation that includes pest control awareness and prevention instruction. Facility Management is responsible for completing a monthly food safety assessment and forwarding the report to the corporate QA Manager for review. Corporate QA Manager inspects each facility quarterly to ensure compliance at all levels.

RIV000322

Exhibit K

*Arnold Logistics LLC*
*Corporate Seal Policy*

| Department | Section | Document no. | | Page no. |
|---|---|---|---|---|
| MIS | Quality Assurance | MIS-CP-0004 | | 1 of 4 |
| Title | | | Effective date | Revision date |
| Corporate Seal Policy | | | March 5, 2006 | August 1, 2006 |

1.0 Document history and approvals

Revision History

| Version | Date | Revised by: | Description of Change |
|---|---|---|---|
| Draft 1.0 | August 1, 2006 | Harry Ward | Original Version |

Approval History

| Version | Date | Approved by: | Signature | Title |
|---|---|---|---|---|
| Draft 1.0 | | T. Collingsworth | | Dir. Risk Mgmt |

| Section | Page number |
|---|---|
| 1.0 Document History and Approvals | 1 |
| 2.0 Purpose | 1 |
| 3.0 Reference | 1 |
| 4.0 Introduction | 2 |
| 5.0 Inbound Shipments | 2 |
| 6.0 Outbound Shipments | 4 |

2.0 Purpose

RIV000323

The purpose of this procedure is to outline specific actions required to be performed by Arnold Logistics staff in regards to the verification, removal (inbound shipments) and placement (outbound shipments) of container seals.

3.0 Reference

MIS-UP-0001 Receiving
MIS-UP-0027 Shipping

| Department | Section | Document no. | | Page no. |
|---|---|---|---|---|
| MIS | Quality Assurance | MIS-CP-0004 | | 2 of 4 |
| Title | | | Effective date | Revision date |
| Corporate Seal Policy | | | March 5, 2006 | August 1, 2006 |

4.0 Introduction

Uniquely number seals serve as an effective deterrent to theft during transit as well as establishing responsibility for the condition of the cargo. The Arnold Logistics Seal Policy serves as the company's direction to each distribution center and may only be superseded by individual contract with specific guidance documented in a Scope of Work (SOW).

The Arnold Logistics Seal Policy has been established by and may only be amended with approval from the Director of Risk Management or President / CEO.

5.0 Inbound Shipments

5.1 There are 3 scenarios that Forklift Operators (FLO) may encounter with inbound trailers:

5.1.1 Live-loaded trailers
5.1.2 LTL (Less-Than-Truckload)
5.1.3 Dropped trailers

5.2 For live trailers;

5.2.1 FLO (or designated staff member) breaks the seal.

5.2.2 Records the seal # on the tally sheet / BOL.

5.2.3 Write "Seal in tact" on the BOL.

5.2.4 Discard the seal.

5.3 For LTL shipments that do not require a seal, the FLO will check that a lock is being used and witness its removal at the facility.

5.3.1 If a lock is not in place, the FLO will make note on the inbound bill.

43

RIV000324

| Department | Section | Document no. | | Page no. |
|---|---|---|---|---|
| MIS | Quality Assurance | MIS-CP-0004 | | 3 of 4 |
| Title | | | Effective date | Revision date |
| Corporate Seal Policy | | | March 5, 2006 | August 1, 2006 |

5.4  For Dropped trailers;

    5.4.1  Record the seal # on the BOL.

    5.4.2  Write "Seal in tact" on the BOL.

    5.4.3  LEAVE SEAL IN PLACE.

    5.4.4  The trailer will then be dropped in the yard.

    5.4.5  When the jockey moves the dropped trailer to the dock, they will report to the facility office to have a FLO assigned who will remove the seal and follow the same procedures as if a live inbound.

        5.4.5.1  If the seal # does not match, or if the seal is broken, the FLO notifies their immediate supervisor.

            5.4.5.1.1  The Supervisor conducts a preliminary investigation by asking the driver the whereabouts of the seal.

                5.4.5.1.1.1  If there is a seal on the trailer with a different number from the one listed on the BOL, the Supervisor will note that number of the seal that is in place on the BOL.

                5.4.5.1.1.2  If no seal is found, the Supervisor will note that on the BOL.

                5.4.5.1.1.3  Additionally, the Supervisor will note the driver's response(comments, explanations, etc.) on the BOL.

            5.4.5.1.2  After the inquiry and documentation is complete, the Supervisor must inspect the contents of the trailer.

                5.4.5.1.2.1  The Supervisor (if on first shift) will contact the customer for consultation and approval to off-load.

                5.4.5.1.2.2  If the event occurs at a time when the customer is not available, the load may be held in the trailer, rejected based on condition or off-loaded and held in quarantine pending disposition from the customer.

| Department | Section | Document no. | | Page no. |
|---|---|---|---|---|
| MIS | Quality Assurance | MIS-CP-0004 | | 4 of 4 |
| Title | | | Effective date | Revision date |
| Corporate Seal Policy | | | March 5, 2006 | August 1, 2006 |

5.5  If at any time during loading / off-loading the FLO or Supervisor suspects the product has been damaged from tampering or shortages close the doors and reject the load.

6.0  Outbound Shipments

44

RIV000325

6.1  We have 2 scenarios for outbound trailers

    6.1.1    Live-loaded trailers

    6.1.2    Dropped trailers

6.2  After loading the trailer the forklift operator will turn the paperwork into the office and tell the account rep if this is a live driver, or that the driver is not here.

    6.2.1    The account rep will process the paperwork, creating the BOL for live drivers or filing in the appropriate bin for drop trailers, and assigning a seal(s) to the BOL

    6.2.2    For live drivers, after the BOL is printed the account rep will assign a forklift operator to forward the BOL to the driver for signature.

        6.2.2.1    The FLO will seal the trailer.

    6.2.3    Seals for dropped trailers will be attached to the pick sheet and remain in the shipping office. One of two things will happen with these bills:

        6.2.3.1    The driver will come in for the load or,

        6.2.3.2    The trailer will be moved to the dropped trailer location.

            6.2.3.2.1    If the driver comes reports to the shipping office for the load, the Account Representative(s) will follow the steps outlined in 1) above.

            6.2.3.2.2    When a trailer that is  moved to the drop lot is loaded, the FLO completes a "move request form" and places it in the "Move-bin" located outside of the shipping office.

        6.2.3.3    Throughout the shift, a lead FLO or Supervisor, working in conjunction with the jockey picks up the move forms and the matching BOL's being held in the shipping office and as the trailers are pulled from the door, attaches the appropriate seal before it is transported to the drop lot.

RIV000326



RIV000327